UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

EMILY MASSEY, on behalf of
RHONDA WARE, deceased,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:15-cv-744
Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Emily Massey, on behalf of her deceased mother Rhonda Ware, brings this action

pursuant to 42 U.S.C. § 405(g) for review of the final decision of the Commissioner of Social

Security ("Commissioner") denying Ms. Ware's (hereinafter "plaintiff") applications for

disability insurance benefits ("DIB") and supplemental security income ("SSI"). This matter is

before the Court on plaintiff's statement of errors (Doc. 11), the Commissioner's response in

opposition (Doc. 18), and plaintiff's reply memorandum (Doc. 20).

**I. Procedural Background**

Plaintiff filed applications for DIB and SSI in August 2007, alleging disability since

December 1, 2003 due to hypothyroidism, hyperthyroidism, chronic fatigue syndrome, thyroid

eye disease, panic disorder, agoraphobia, hepatitis C, and a thyroid growth. (Tr. 271). The

application was denied initially and upon reconsideration. Plaintiff, through counsel, requested

and was granted a *de novo* hearing before administrative law judge ("ALJ") Thomas R.

McNichols II. Plaintiff, a vocational expert ("VE"), and medical expert Mary Buban, Psy.D.,

appeared and testified at the ALJ hearing. In January 2011, ALJ McNichols issued a decision

denying plaintiff's applications, and the Appeals Council denied plaintiff's request for review in

April 2012. In January 2013, this Court remanded the case on stipulation of the parties, and the

Appeals Council subsequently vacated ALJ McNichols' decision. (Tr. 1274, 1277-80). On June 11, 2014, plaintiff and a VE appeared and testified at a hearing before ALJ David A. Redmond. On October 23, 2014, ALJ Redmond issued a decision denying plaintiff's applications. (Tr. 1282-1305). The Appeals Council chose not to assume jurisdiction in October 2015, making ALJ Redmond's decision the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

2

> 5) If the claimant can make an adjustment to other work, the claimant is not
> disabled. If the claimant cannot make an adjustment to other work, the claimant
> is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] last met the insured status requirements of the Social Security
> Act through March 31, 2007.
>
> 2. The [plaintiff] died on or about August 3, 2014.[1]
>
> 3. The [plaintiff] did not engage in substantial gainful activity from December 1,
> 2003, the alleged disability onset date, through August 3, 2014, the date of her
> death (20 CFR 404.1571 *et seq.*, and 416.971, *et seq.*).
>
> 4. The [plaintiff] had the following severe impairments: lumbago/degenerative
> disc disease, foot pain of undetermined etiology, Hashimoto's thyroiditis, major
> depressive disorder, anxiety disorder with features of panic disorder and post-
> traumatic stress disorder, personality disorder, [and] history of substance use
> disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 5. The [plaintiff] did not have an impairment or combination of impairments that
> met or medically equaled the severity of one of the listed impairments in 20 CFR

---

[1] Plaintiff's death certificate noted a presumed date of death of August 3, 2014. (Tr. 1994).

3

Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. Prior to her death, the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) subject to the following additional limitations: a ten-pound maximum lifting capacity; the opportunity to alternate between sitting and standing as needed with the option to sit as much as 15 minutes during every hour of work; only unskilled work featuring no more than occasional personal contact and no production quotas.

7. The [plaintiff] was unable to perform past relevant work (20 CFR 404.1565 and 416.965).[2]

8. The [plaintiff] was born [in] . . . 1960. Prior to attaining age 50 in June 2010, the [plaintiff] was classified as a "younger individual" for Social Security purposes. From age 50 through the date of her death, the [plaintiff] was classified as an individual who was "closely approaching advanced age" (50-54 years old) for Social Security purposes (20 CFR 404.1563 and 416.963).

9. The [plaintiff] had a college education with an associate's degree in nursing (20 CFR 404.1564 and 416.964).

10. The [plaintiff] did not have "transferable" work skills within the meaning of the Social Security Act (20 CFR 404.1568 and 416.968).

11. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the [plaintiff] could have performed (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

12. The [plaintiff] was not "disabled," as defined in the Social Security Act, from December 1, 2003, through the date of her death (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 1288-1305).

---

[2] Plaintiff's past relevant work was as a registered nurse, a skilled position performed at the heavy exertion level by plaintiff. (Tr. 1231, 1303).

[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform as many as 6,200 unskilled jobs at the light exertion level regionally, including assembly machine tender, inspector, and hand packager. (Tr. 1232, 1304).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. The denial of plaintiff's DIB application is the only issue in this appeal.

Ms. Massey is not entitled to seek retroactive SSI benefits based on the application of her

deceased mother. SSI benefits that are owed to a deceased claimant are payable only to the claimant's "surviving spouse" or, in the case of a disabled or blind child, to a parent, if the child "was living with his parent or parents at the time of his death or within 6 months immediately preceding the month of such death." 42 U.S.C. § 1383(b)(1)(A). Regulations governing SSI benefits further provide that "[n]o benefits may be paid to the estate of any unpaid recipient . . . or to any survivor other than those listed in paragraph (b)(1) through (3) of this section [eligible surviving spouse or parent]." 20 C.F.R. § 416.542(b)(4). *See Smith v. Califano,* 597 F.2d 152, 155-56 (9th Cir. 1979) (plain language of then-operative version of 42 U.S.C. § 1383(b) and its legislative history made clear that Congress did not intend that Commissioner make posthumous underpayments of Title XVI, or SSI, benefits to anyone except an eligible spouse); *Fowler v. Astrue*, No. 809-CV-1368, 2010 WL 454765, at *1 (M.D. Fla. Feb. 9, 2010) (SSI benefits extinguished on death of son and parents limited to seeking review of denial of son's disability insurance benefits); *Wasilauskis v. Astrue*, No. CIV. 08-284, 2009 WL 861492, at *2-3 (D. Me. Mar. 30, 2009) (Report and Recommendation) (finding mother did not meet statutory or regulatory criteria for entitlement to retroactive SSI benefits on account of deceased son's claim), *adopted*, 2009 WL 1078362 (D. Me. Apr. 21, 2009). Thus, while children of deceased claimants may make a claim for DIB underpayments, 20 C.F.R. § 404.503(b), they may not seek judicial review of a denial of SSI benefits that may have been owed to a deceased parent. 20 C.F.R. § 416.542(b)(4). *See Dykes ex. rel. Brymer v. Barnhart*, 112 F. App'x 463, 466 n. 4 (6th Cir.2004) (noting that daughter of deceased claimant had conceded that SSI benefits, which were payable only to a surviving spouse, were not involved in appeal); *Crim v. Astrue*, No. 1:11-cv-137, 2012 WL 2711456, at *1 n.2 (S.D. Ohio Jul. 9, 2012) (Report and Recommendation) (Bowman, M.J.), *adopted*, 2012 WL 3156130 (S.D. Ohio Aug. 3, 2012) (Dlott, J.) (children of deceased claimants

may make a claim for DIB, but not SSI, underpayments); *Lang ex rel. Morgan v. Astrue*, No. 05-CV-7263, 2008 WL 4829946 (S.D.N.Y. Nov. 5, 2008) (daughter of deceased SSI claimant not entitled to seek review of denial of mother's SSI claim). Because Ms. Massey does not meet the statutory or regulatory requirements for pursuing an underpayment of SSI benefits, the only issue in this appeal is the denial of plaintiff's DIB application, for which plaintiff was fully insured through March 31, 2007.

### E. Specific Error

On appeal, plaintiff raises a single issue: whether substantial evidence supports the ALJ's evaluation and weighing of the medical evidence. (Doc. 11 at 10). Plaintiff argues the ALJ failed to properly weigh the regulatory factors in assessing the opinions of treating physicians John Murphy, D.O., and Mark Jeffries, D.O., and failed to give good reasons for rejecting their opinions. (*Id.* at 12-15). Plaintiff contends the ALJ failed to weigh the opinions of Dr. Buban, the medical expert at plaintiff's first administrative hearing, and William Soto, plaintiff's mental health therapist. (*Id.* at 15-17). Plaintiff also argues the ALJ erred by relying on GAF scores suggestive of moderate symptomatology to reject the opinions of Dr. Murphy, Dr. Jeffries, Dr. Buban, and Mr. Soto.[4] (*Id.* at 17-18). Finally, plaintiff contends the ALJ failed to properly evaluate the opinions of a consultative examining psychologist and non-examining state reviewing psychologists. (*Id.* at 18-19).

---

[4] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

1. *Substantial evidence supports the ALJ's assessment of Dr. Murphy and Dr. Jeffries' opinions.*[5]

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See*

---

[5] The opinions of Dr. Murphy and Dr. Jeffries concern both plaintiff's physical and mental limitations. On appeal, plaintiff only advances arguments concerning the weight given to the treating physicians' opinions about her mental limitations. Thus, the Court will not consider the treating physicians' opinions about plaintiff's physical limitations. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("[I]ssues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR 96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The medical record shows that John Murphy III, D.O., a family medicine doctor, treated plaintiff from March 2000 through December 2004. (*See* Tr. 423-49). Throughout the course of his treatment relationship with plaintiff, Dr. Murphy consistently prescribed Klonopin (a tranquilizer of the benzodiazepine class) for plaintiff's panic disorder. (*See* Tr. 423-49). During this time, Dr. Murphy also prescribed Zoloft and Paxil for plaintiff's depression. (*See* Tr. 427, 437, 447).

9

In June 2004, plaintiff began treating at the Cassano Health Center. (*See* Tr. 680). In May 2005, plaintiff complained to Dr. Micah Davis of being very stressed out and forgetful and having panic attacks for the past two months. (Tr. 676). Dr. Davis found that plaintiff's panic and anxiety were not controlled and prescribed Zoloft, Trazodone (an antidepressant with anti-anxiety effects), and Klonopin. (*Id.*). Dr. Davis found that plaintiff's anxiety was still not controlled at appointments in July and September 2005. (Tr. 668, 671).

Plaintiff first saw Dr. John Murphy IV, a family medicine doctor, at the Cassano Health Center in November 2005.[6] (Tr. 665). Dr. Murphy[7] diagnosed panic disorder and refilled plaintiff's prescriptions for Klonopin and Trazodone. (*Id.*). At monthly appointments from July through November 2006, Dr. Murphy saw plaintiff for non-psychological complaints and he did not note any psychological abnormalities on examination. (*See* Tr. 643, 650, 653-54, 658). At the November 2006 appointment, plaintiff complained of a short-term memory loss and Dr. Murphy referred her to a neurologist. (*See* Tr. 643).

Plaintiff saw neurologist Sheri Hull, D.O., in November 2006. (*See* Tr. 632-35, 640-41). Dr. Hull noted that plaintiff complained of memory loss and difficulty with concentration, walking, balance, ankle pain, and hand numbness. (Tr. 632). On examination, plaintiff showed no problems with attention or recall. (*See* Tr. 640). Dr. Hull opined that "[w]hile not all of her symptoms can be attributed to anxiety, we feel that a vast majority of her examination is functional." (Tr. 634). Dr. Hull further opined that plaintiff suffered from clinical depression,

---

[6] In the statement of errors, plaintiff contends that "Dr. Murphy" treated her for at least seven years before he completed his opinion concerning her functional capacity in August 2007. (*See* Doc. 11 at 13). However, the record shows that Dr. Murphy III treated plaintiff from March 2000 through December 2004. (Tr. 423-49). Dr. Murphy IV only began treating plaintiff in November 2005. (*See* Tr. 665). Thus, contrary to plaintiff's contention, Dr. Murphy IV treated plaintiff for less than two years before rendering his August 2007 opinion.

[7] The references to "Dr. Murphy" herein are to Dr. Murphy IV unless otherwise noted.

noting that plaintiff had "an incredibly flat affect" and "was almost tearful during some part of the interview." (*Id.*). Dr. Hull also opined that "a large number" of plaintiff's symptoms were attributable to her thyroid dysfunction and noted that plaintiff had a history of noncompliance with her thyroid treatment. (*Id.*). Dr. Hull recommended improved compliance with thyroid medications as well as changing or adding another antidepressant. (*Id.*).

At a February 2007 appointment with Dr. Murphy, plaintiff complained of increased anxiety, but Dr. Murphy did not note any psychological abnormalities on examination. (Tr. 624). Dr. Murphy referred plaintiff to psychologist Julie Williams, Psy.D. (*See* Tr. 620, 624). In April 2007, plaintiff canceled and rescheduled her psychology appointment. (Tr. 620). In May 2007, plaintiff complained of increased stress, panic attacks not helped by Klonopin, and worsening memory. (Tr. 617). Dr. Murphy diagnosed anxiety and depression, prescribed Celexa (an antidepressant also used to treat panic disorder), Trazodone, and Klonopin, and again referred plaintiff to psychologist Williams. (*Id.*). In July 2007, plaintiff again canceled and rescheduled her psychology appointment. (Tr. 614). Also in July 2007, plaintiff complained to Dr. Murphy of increased anxiety and he increased her dosage of Celexa. (Tr. 613). In August 2007, plaintiff complained to Dr. Murphy of depression, being overwhelmed by stress due to recent homelessness, and more frequent panic attacks. (Tr. 611). Dr. Murphy noted that plaintiff was tearful on physical examination. (*Id.*). Plaintiff "no showed, no called" for her psychology appointment with Dr. Williams in September 2007. (Tr. 609).

On August 21, 2007, Dr. Murphy completed a mental functional capacity assessment. (Tr. 544-45). Dr. Murphy opined that plaintiff was extremely limited in her ability to interact appropriately with the general public and markedly limited in the following abilities: (1) remember locations and work-like procedures; (2) understand and remember detailed

11

instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) be aware of normal hazards and take appropriate precautions; and (5) travel in unfamiliar places or use public transportation. (Tr. 544). Additionally, Dr. Murphy opined that plaintiff was moderately limited in the following abilities: (1) understand and remember very short and simple instructions; (2) carry out very short and simple instructions; (3) carry out detailed instructions; (4) maintain attention and concentration for extended periods; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted by them; (7) make simple work-related decisions; (8) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace; (9) ask simple questions or request assistance; (10) accept instructions and respond appropriately to criticism; (11) get along with coworkers or peers; (12) maintain socially appropriate behavior; (13) respond appropriately to changes in the work setting; and (14) set realistic goals or make plans independently of others. (*Id.*). Dr. Murphy offered the following observations in support of his functional limitation findings: "[Plaintiff] has severe anxiety [with] panic attacks. Symptoms worse in general public. [Plaintiff] also has dizziness and headaches associated [with] thyroid abnormalities." (Tr. 545). Dr. Murphy opined that plaintiff was unemployable. (*Id.*).

Plaintiff began treating with Dr. Jeffries, a family medicine doctor, in January 2009. (Tr. 977). Dr. Jeffries noted a normal physical examination and prescribed Trazodone and Klonopin. (Tr. 977-78). Dr. Jeffries continued to treat plaintiff on a monthly basis through September 2010. (*See* Tr. 958-76, 1051-1137). During that time, Dr. Jeffries rarely noted any psychological abnormalities during his examinations of plaintiff. (*See id.*). Dr. Jeffries continued to treat plaintiff with Trazodone and Klonopin. (*See id.*).

12

In August 2010, Dr. Jeffries answered a set of interrogatories for disability purposes. (Tr. 832-41). Dr. Jeffries opined that plaintiff's panic disorder and posttraumatic stress disorder increased her sensitivity to pain. (Tr. 833). Dr. Jeffries indicated that every time he treated plaintiff, "she was here for pain and stress." (Tr. 834). Dr. Jeffries opined that plaintiff would not be prompt and regular in attendance in a work setting because "her stress level appeared to be related to the level of pain." (Tr. 835). He opined that plaintiff could not withstand normal work pressures and would be unable to sustain attention and concentration because of her stress and pain. (Tr. 836). He opined that plaintiff would be able to behave in an emotionally stable manner, work in coordination with others, and understand, remember, and carry out simple work instructions when on her stress medications. (Tr. 836-37, 840). Dr. Jeffries "assumed" that plaintiff would be able to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 838). He opined that plaintiff would not be able to complete a normal workday and workweek without interruption from her symptoms because she was "still working with pain and stress" and "her human behavior would dictate this." (*Id.*). He opined that plaintiff would not be able to respond appropriately to changes in a routine work setting because she "would need postural changes due to [her] back." (Tr. 839). Further, Dr. Jeffries opined that plaintiff had moderate restriction in activities of daily living, no difficulties in maintaining social functioning, and marked deficiencies of concentration, persistence, or pace. (Tr. 840-41).

The ALJ gave no weight to the opinions of Dr. Murphy and Dr. Jeffries about the degree of plaintiff's limitations due to her mental conditions. (Tr. 1293). Further, the ALJ gave no weight to their conclusion that plaintiff was unemployable because the issue of whether an

13

individual is employable is reserved to the Commissioner.[8] (*Id.*). The ALJ also gave no weight to their opinions that plaintiff experienced marked or extreme limitations in her mental functioning capabilities because "[t]hose conclusions are neither well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record." (Tr. 1294). The ALJ also noted that while Dr. Murphy and Dr. Jeffries are family medicine physicians, "recognized mental health professionals" such as the consultative examining psychologist and non-examining state reviewing psychologists described a "much less significant degree of mental limitation." (*Id.*). Moreover, the ALJ gave little to no weight to Dr. Jeffries' opinion that plaintiff experienced marked limitation in her ability to maintain concentration, persistence, and pace because that opinion "is inconsistent with other compelling evidence contained in the record." (Tr. 1296).

Here, the ALJ gave good reasons for not giving Dr. Murphy and Dr. Jeffries' opinions controlling weight and those reasons are substantially supported by the record. First, the ALJ properly considered the fact that Dr. Murphy and Dr. Jeffries are not specialists in mental health treatment. *See* 20 C.F.R. § 404.1527(c)(5). Moreover, substantial evidence supports the ALJ's determination that their opinions were not well supported and were inconsistent with substantial evidence of record. Dr. Murphy's opinion provides no support for the limitations that he found beyond the conclusory statements that plaintiff had severe anxiety with panic attacks and that her symptoms were worse when in the general public. (*See* Tr. 545). Likewise, Dr. Jeffries' opinion provides no support for the limitations that he found beyond the conclusory statements that plaintiff's ability to function was related to her level of stress and pain. (*See* Tr. 833-38). *See*

---

[8] Contrary to the ALJ's finding, neither Dr. Jeffries' interrogatory responses nor his treatment records explicitly state the opinion that plaintiff was "unemployable."

14

*Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation.").

Dr. Murphy's opinion was also inconsistent with plaintiff's treatment record. First, Dr. Murphy did not note any abnormal psychological findings on examination at any of plaintiff's appointments, except that plaintiff was tearful on examination in August 2007 after she became homeless. (*See* Tr. 611, 613, 617, 624, 643, 650, 653-54, 658, 665). Further, plaintiff's neurological consultation with Dr. Hull in November 2006 did not support plaintiff's complaints of memory loss as she showed no problems with attention or recall on neurological examination. (*See* Tr. 640). Moreover, Dr. Murphy treated plaintiff's mental condition only with medications. While Dr. Murphy referred plaintiff to Dr. Williams for a psychological consultation, plaintiff repeatedly failed to keep that appointment. (*See* Tr. 609, 614, 620, 624). *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009) (holding that while "[f]or some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself," the lack of any evidence in the record explaining the failure to seek treatment might cause a "reasonable mind" to find that a plaintiff's mental symptoms were less severe when treatment was not being sought).

Similarly, Dr. Jeffries rarely noted any psychological abnormalities on examination. (*See* Tr. 958-76, 1051-1137). Further, his treatment records do not contain any findings concerning plaintiff's ability to maintain concentration, persistence, or pace that could support his opinion that plaintiff experienced a marked limitation in that area of functioning. (*See id.*).

For these reasons, the Court determines that the ALJ reasonably declined to give Dr. Murphy and Dr. Jeffries' opinions controlling weight. *See Gayheart*, 710 F.3d at 376.

15

Moreover, substantial evidence supports the ALJ's consideration of the regulatory factors in weighing their opinions. *See* 20 C.F.R. § 404.1527(c)(2)-(6). The ALJ noted that he evaluated their opinions under the regulatory factors. (*See* Tr. 1294). As already explained, the reasons the ALJ gave in support of discounting their opinions were good reasons. Further, these reasons "reache[d] several of the factors that an ALJ must consider." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). For example, the ALJ noted that Dr. Murphy and Dr. Jeffries are family medicine physicians, not "recognized mental health professionals." (Tr. 1294); 20 C.F.R. §404.1527(c)(5). Further, the ALJ concluded that their opinions lacked support and were inconsistent with the medical evidence. *See* 20 C.F.R. § 1527(c)(3)-(4). Thus, the ALJ stated good reasons for discounting their opinions that are consistent with the regulatory factors the ALJ must consider.

Further, the Court concludes that even if the ALJ had failed to properly assess Dr. Jeffries' opinion, any resulting error would be harmless. Specifically, Dr. Jeffries rendered his opinion in August 2010, or more than three years after plaintiff's date last insured in March 2007. Further, Dr. Jeffries did not begin treating plaintiff until January 2009, nearly two years after her date last insured. Because only the denial of plaintiff's DIB application is at issue in this appeal, *see* 20 C.F.R. §§ 404.503, 416.542; *Crim*, 2012 WL 2711456 at *1 n.2, Dr. Jeffries' opinion concerning plaintiff's condition in August 2010 lacks relevance in the absence of any indication in the record that he had considered plaintiff's condition and medical evidence from before her date last insured in rendering his opinion.

Finally, plaintiff briefly argues that the ALJ improperly considered plaintiff's substance abuse history and non-compliance with treatment recommendations in weighing the treating physicians' opinions. (Doc. 11 at 15).

16

In discounting Dr. Murphy's opinion that plaintiff was unemployable, the ALJ stated: "It appears evident that two primary bases for [plaintiff's] problems were (1) her non-compliance with treatment recommendations (as manifested by her failure to follow through with treatment . . . and her possible misuse of prescribed medication) and (2) her periodic abuse involving both alcohol and illegal drugs." (Tr. 1300).

As to noncompliance with treatment recommendations, the record shows that plaintiff repeatedly canceled or failed to keep scheduled appointments with Dr. Williams after Dr. Murphy referred her for psychological evaluation and treatment. (*See* Tr. 609, 614, 617, 620, 624). Plaintiff argues that her failure to seek psychological treatment was a symptom of her disorder itself, especially given her "poor insight and judgment generally." (Doc. 11 at 15). However, the record is devoid of any evidence that her failure to seek psychological treatment was a symptom of her mental condition, especially when she regularly kept frequent appointments with her treating physicians. *See White*, 572 F.3d at 283-84.

Further, the record also contains substantial evidence of plaintiff's drug seeking behavior. For example, on more than one occasion plaintiff attempted to get additional prescriptions for Klonopin by claiming that her pills had been stolen. (*See* Tr. 445-May 2000; Tr. 608-September 2007). In January 2002, Dr. Murphy III discussed with plaintiff Klonopin's potential for drug abuse and stated that Klonopin was not a good choice for plaintiff given her history of cocaine abuse. (*See* Tr. 439). In October 2007, plaintiff had a positive drug screen when she sought treatment at the emergency department. (Tr. 881). Psychiatrist Vinod Patwa, M.D., noted that plaintiff was "extremely manipulative, demanding, and extremely med-seeking" during a November 2009 hospitalization. (Tr. 908). Dr. Patwa further stated that plaintiff "lied through her teeth" while hospitalized and "it became very clear that she did abuse prescription Wygesic

17

for a year." (Tr. 911). In April 2013, plaintiff was transported to the emergency department after she was found unresponsive due to a drug overdose. (*See* Tr. 1738-39, 1744, 1746-50).

Relying on *Gayheart*, plaintiff argues that the ALJ erred by considering plaintiff's history of substance abuse in weighing Dr. Murphy's opinion because it was improper to consider plaintiff's substance abuse without first finding that she was disabled. (Doc. 11 at 15). *See Gayheart*, 710 F.3d at 381 ("Alcohol abuse is not a factor to be considered in determining the weight to be given to a treating-source opinion."). In *Gayheart*, the Sixth Circuit reversed and remanded the ALJ's decision that the plaintiff was not disabled because the ALJ failed to provide good reasons for not giving the treating physician's opinion controlling weight and failed to properly weigh that opinion under the regulatory factors in 20 C.F.R. § 404.1527(c). 710 F.3d at 376-78. The Sixth Circuit instructed that if the plaintiff was found to be disabled on remand, "the materiality of his alcohol abuse needs to be reevaluated with proper attention to the record. *Id.* at 381. Here, even if the ALJ erred under *Gayheart* in referring to plaintiff's history of substance abuse, such error was harmless because unlike the situation the Sixth Circuit considered in *Gayheart*, as explained above substantial evidence independent of plaintiff's history of substance abuse supports the ALJ's decision to give no weight to Dr. Murphy's opinion.

Based on the foregoing, substantial evidence supports the ALJ's assessment of Dr. Murphy and Dr. Jeffries' opinions.

### 2. *Substantial evidence supports the ALJ's assessment of Dr. Buban's opinion.*

"[O]pinions from nontreating . . . sources are never assessed for 'controlling weight.'" *Gayheart*, 710 F.3d at 376. "The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only

if a treating-source opinion is not deemed controlling." *Id.* (citing 20 C.F.R. § 404.1527(c)).
"Other factors 'which tend to support or contradict the opinion' may be considered in assessing
any type of medical opinion." *Id.* (quoting 20 C.F.R. § 404.1527(c)(6)).

 Dr. Buban, a clinical psychologist, testified as a medical expert at plaintiff's December
2010 administrative hearing. (Tr. 41). Dr. Buban summarized the November 2007 examination
findings of consultative clinical psychologist Craig D. Olson, Psy.D., treatment records from a
November 2009 psychiatric hospitalization, and therapy records from 2009. (*See* Tr. 75-76).
Based on these records, Dr. Buban opined that she did not think plaintiff was able to sustain full-
time work. (Tr. 76). Dr. Buban opined that Dr. Jeffries' assessment of marked limitation in the
ability to maintain concentration, persistence, and pace was "probably accurate." (Tr. 78). Dr.
Buban believed that plaintiff would have difficulty sustaining a 40-hour workweek because of
"an extremely low stress tolerance." (*Id.*). Dr. Buban opined that because of stress and anxiety,
plaintiff should be restricted from interacting with the general public and from performing fast
paced work with high production quotas. (Tr. 78-79). Dr. Buban testified that the "biggest
drawback" in assessing plaintiff's allegations of memory loss was the lack of objective evidence
in the medical record. (Tr. 80). Dr. Buban testified that an assault in September 2007 was
significant to her determination that plaintiff would be unable to perform full-time work. (*See*
Tr. 82).

 The ALJ stated that after considering the regulatory factors, he gave little weight to Dr.
Buban's opinion. (Tr. 1297). The ALJ rejected Dr. Buban's opinion that plaintiff was unable to
sustain full-time work because that issue was reserved to the Commissioner. (*See id.*). The ALJ
noted that while he had considered Dr. Buban's concurrence with the opinion of Dr. Jeffries that

19

plaintiff experienced marked limitation in the ability to maintain concentration, persistence, or pace, he gave that opinion little to no weight. (*Id.*).

Substantial evidence supports the ALJ's consideration of the regulatory factors in weighing Dr. Buban's opinion. *See* 20 C.F.R. § 404.1527(c)(1)-(6). The ALJ noted that he evaluated Dr. Buban's opinions under the regulatory factors (*see* Tr. 1297), and the ALJ's analysis of Dr. Buban's opinion "reache[d] several of the factors that an ALJ must consider." *Allen*, 561 F.3d at 651. For example, the ALJ noted that Dr. Buban was an expert in psychology who had not examined plaintiff. (Tr. 1296-97); *see* 20 C.F.R. § 404.1527(c)(1) and (5). Further, it is clear from the ALJ's analysis that he rejected Dr. Buban's opinions concerning plaintiff's inability to sustain full-time work and limited ability to maintain concentration for the same reasons that the ALJ rejected the opinions of Dr. Murphy and Dr. Jeffries. (*See* Tr. 1297). Thus, the ALJ implicitly considered the factors of supportability and consistency that he considered in rejecting the treating physician opinions. *See* 20 C.F.R. § 1527(c)(3)-(4).

Finally, the Court concludes that even if the ALJ had failed to properly assess Dr. Buban's opinion, any resulting error would be harmless. Dr. Buban premised her opinion on Dr. Olson's November 2007 examination findings, plaintiff's November 2009 psychiatric hospitalization, and therapy records from 2009. All of the records on which Dr. Buban relied are from after plaintiff's date last insured. Further, Dr. Buban specifically cited a September 2007 assault as being significant to her opinion that plaintiff would be unable to perform full-time work. (*See* Tr. 82). This assault also occurred after plaintiff's date last insured in March 2007. Dr. Buban's opinion that plaintiff was unable to perform full-time work relied entirely on plaintiff's condition and medical evidence post-dating the expiration of plaintiff's insured status. There is no evidence Dr. Buban related her opinion prior to plaintiff's date last insured. Thus,

20

Dr. Buban's opinion is simply not relevant to the denial of plaintiff's DIB application at issue in this appeal. *See* 20 C.F.R. §§ 404.503, 416.542; *Crim*, 2012 WL 2711456 at \*1 n.2.

Based on the foregoing, substantial evidence supports the ALJ's assessment of Dr. Buban's opinion.

3. *Substantial evidence supports the ALJ's assessment of Dr. Olson's opinion.*

Dr. Olson, a clinical psychologist, examined plaintiff in November 2007 for disability purposes. (Tr. 547-52). On clinical examination, Dr. Olson noted that plaintiff was cooperative, task motivation was good, task persistence was fair to poor, attention/concentration was fair, and response to direction/redirection was fair to good. (Tr. 549). Plaintiff's conversation was logical most times but often rambling. Dr. Olson did not note any difficulties with expressive or receptive language skills. (*Id.*). Plaintiff's affect was labile and her mood was depressed. (Tr. 550). Plaintiff cried "a number of times" during the interview. (*Id.*). She reported constant anxiety and Dr. Olson noted signs of anxiety during the interview as plaintiff "seemed somewhat distracted or possibly disassociated, and her eyes were staring." (*Id.*). Plaintiff's concentration and attention skills were fair during the interview and she successfully completed two of three mental control tasks. Plaintiff's memory skills seemed to be intact during the interview, but she recalled the name of only one object out of three after a five minute delay. (*Id.*). Dr. Olson believed that plaintiff's "apparent difficulties recalling the names of items may have been due to her anxiety and/or what appeared to be disassociate state." (Tr. 550-51). Plaintiff's insight was intact but somewhat marginal and her judgment was marginal. (Tr. 551).

Dr. Olson diagnosed plaintiff with posttraumatic stress disorder, panic disorder, dysthymia, borderline personality disorder, and cocaine dependence in reported sustained full remission. (*Id.*). Dr. Olson opined that plaintiff's symptoms fell in the moderate range and he

21

assessed a GAF score of 52. (Tr. 551-52). Plaintiff's overall functioning seemed "moderately impaired, given her past interpersonal difficulties, and few friends." (Tr. 551). Dr. Olson opined that plaintiff's ability to relate to others was moderately impaired by plaintiff's depression, anxiety, and personality disorder symptoms. (Tr. 552). With this level of impairment, Dr. Olson believed plaintiff would be able to relate to coworkers and supervisors to complete simple, repetitive tasks to detailed level tasks and procedures in a work environment that did not require frequent or prolonged interpersonal interactions. (*Id.*). Dr. Olson opined that plaintiff's ability to understand, remember, and follow instructions was "fair and unimpaired" with no signs of "significant comprehension or memory problems during the clinical interview." (*Id.*). Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks was moderately impaired due to plaintiff's anxiety and possible dissociative state. Finally, Dr. Olson opined that plaintiff's ability to withstand the stress and pressure of full-time work activity was moderately impaired. (*Id.*).

Robelyn Marlow, Ph.D., a non-examining state reviewing psychologist, reviewed the record in December 2007 and found that plaintiff was moderately limited in the following areas: (1) the ability to understand and remember detailed instructions; (2) the ability to carry out detailed instructions; (3) the ability to maintain attention and concentration for extended periods; and (4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 572-74). In reaching these conclusions, Dr. Marlow summarized the results of Dr. Olson's examination and gave "overall weight" to Dr. Olson's opinion. (Tr. 574). On reconsideration in June 2008, Katherine Lewis, Psy.D., reached the same conclusions. (Tr. 719).

22

Plaintiff's primary objection to the ALJ's assessment of the opinions of Dr. Olson and the non-examining state reviewing psychologists is plaintiff's contention that the ALJ failed to properly weigh the regulatory factors as to their opinions and "failed to actually assign weight to their opinions at all." (Doc. 11 at 18). While the ALJ does not explicitly state the precise amount of weight he gave to the opinions of Dr. Olson and the non-examining state reviewing psychologists, it is clear from the ALJ's decision that he gave more weight to their opinions than to those of any other medical source. Specifically, the ALJ summarized all the medical source opinions as to plaintiff's limitations in activities of daily living, ability to relate to others, ability to maintain concentration, persistence, or pace, and ability to handle work stress. (*See* Tr. 1295-96). In assessing the level of plaintiff's restrictions in each of these areas, the ALJ relied heavily on, and generally concurred with, the opinions of Dr. Olson and the non-examining state reviewing psychologists. (*See id.*). For example, in finding mild limitation in plaintiff's ability to perform activities of daily living, the ALJ gave "great weight" to the opinions of the non-examining state reviewing psychologists and also relied on Dr. Olson's opinion. (*See* Tr. 1295). Likewise, in finding moderate limitation in plaintiff's ability to maintain social functioning, the ALJ concluded that Dr. Olson's opinion "represents the most credible estimation" of plaintiff's impairment in that area. (Tr. 1296). In this area, the ALJ gave "little weight" to the opinions of the non-examining state reviewing psychologists that plaintiff experienced only mild limitation in social functioning. (*Id.*). Similarly, in finding moderate limitation in plaintiff's ability to maintain concentration, persistence, or pace, the ALJ concluded that the opinions of Dr. Olson and the non-examining state reviewing psychologists were more credible than the opinion of Dr. Jeffries. (*See id.*). Thus, plaintiff's argument that the ALJ did not assign weight to their opinions is not well-taken.

23

Further, while the ALJ's decision as to the opinions of Dr. Olson and the non-examining state reviewing psychologists is not a model of clarity, the ALJ at least implicitly weighed the regulatory factors in considering those opinions.  For example, the ALJ noted that in contrast to plaintiff's treating physicians, Dr. Olson and the non-examining state reviewing psychologists are experts in mental health.  (Tr. 1294); *see* 20 C.F.R. §404.1527(c)(5).  The ALJ's analysis also shows that he considered the regulatory factors of consistency and supportability in weighing the opinions of Dr. Olson and the non-examining state reviewing psychologists concerning plaintiff's ability to perform activities of daily living, relate to others, maintain concentration, persistence, or pace, and handle work stress.  (*See* Tr. 1295-96); *see* 20 C.F.R. § 1527(c)(3)-(4).

Finally, plaintiff argues that the ALJ relied too much on the opinions of Dr. Olson and the non-examining state reviewing psychologists because they "reviewed a record that did not contain substantial evidence," including Dr. Jeffries' treatment records and opinion, therapy records from 2009, and hospitalization records from 2009 and 2010.  (Doc. 20 at 5).  However, as already explained above, these records are not relevant to the question of whether plaintiff was disabled prior to her date last insured in March 2007, which is the only issue remaining in this appeal. *See* 20 C.F.R. §§ 404.503, 416.542; *Crim*, 2012 WL 2711456 at *1 n.2.

Based on the foregoing, substantial evidence supports the ALJ's assessment of the opinions of Dr. Olson and the non-examining state reviewing psychologists.

4.  *Substantial evidence supports the ALJ's assessment of Mr. Soto's opinion.*

Mr. Soto completed a mental functional capacity assessment for the Ohio Department of Job and Family Services in August 2010.  (Tr. 744-45).  He indicated that he was a C.T.  (*See* Tr. 744).  Mr. Soto opined that plaintiff was markedly limited in the following abilities:  (1) understand and remember both simple and detailed instructions; (2) carry out detailed

24

instructions; (3) maintain attention and concentration for extended periods; (4) perform activities within a schedule and maintain regular attendance; (5) sustain an ordinary routine without special supervision; (6) work in coordination with or proximity to others without being distracted; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms; (8) accept instruction and respond appropriately to criticism from supervisors; (9) get along with coworkers without distracting them or exhibiting behavioral extremes; and (10) travel in unfamiliar places or use public transportation. Mr. Soto further opined that plaintiff was moderately limited in the following abilities: (1) remember locations and work-like procedures; (2) carry out simple instructions; (3) make simple work-related decisions; (4) interact appropriately with the general public; (5) ask simple questions or request assistance; (6) maintain socially appropriate behavior; (7) respond appropriately to changes in the work setting; (8) be aware of normal hazards and take appropriate precautions; and (9) set realistic goals or make plans independently of others. Mr. Soto concluded that plaintiff was unemployable. (*Id.*). He left blank the portion of the form asking him to indicate the date of plaintiff's last exam. (*See id.*).

The form asked Mr. Soto to summarize the results of plaintiff's mental status examination. (Tr. 745). Mr. Soto diagnosed plaintiff with panic disorder by history and posttraumatic stress disorder. Mr. Soto further stated:

> [Plaintiff] has experienced and witnessed events that involved actual serious injury and a threat to her physical integrity and that of others. She continues to have intrusive distressing recollections of the events including images and thoughts. She also takes great measures to avoid thoughts and feelings of said events. [Plaintiff] also is experiencing major depression and anxiety that persist daily for about 10 years. [She] sees a therapist . . . and also sees a [doctor] for med regulation. [Plaintiff's] affect is mood congruent and is often tearful. While she is oriented x4 she maintains poor recall of recent memories and lives in fear.

(*Id.*).

The ALJ gave little weight to Mr. Soto's opinion after concluding that he was not an acceptable medical source. (Tr. 1294). The ALJ found that as a therapist, Mr. Soto's opinion did not equal in probative value the opinions of evaluating and examining psychologists who were acceptable medical sources. (Tr. 1294-95). The ALJ concluded that the weight of the medical evidence did not support Mr. Soto's opinion that plaintiff was unemployable. (Tr. 1295).

In Ohio, a C.T., or counselor trainee, "is an individual seeking licensure as a professional counselor" who is supervised by a licensed professional counselor or licensed professional clinical counselor. *See* State of Ohio, Counselor, Social Worker, and Marriage and Family Therapist Board, "Counselor Trainee," *available at* cswmft.ohio.gov/Counselors/ CounselorTrainee.aspx. Ohio defines "counselor trainee" as a "status," not a license and provides that "counselor trainee status is not a substitute for licensure." *See id.*; Ohio Admin. Code § 4757-13-09(B).

Under the regulations, acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a). All other medical sources are classified as "other sources." 20 C.F.R. § 404.1513(d)(1). Because a counselor trainee is not a licensed or certified psychologist, the ALJ properly determined that Mr. Soto was not an acceptable medical source. *See* Ohio Admin. Code § 4757-13-09(B); 20 C.F.R. § 404.1513(a).

While information from "other sources" cannot establish the existence of a medically determinable impairment, such information "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the

26

individual's ability to function." Social Security Ruling (SSR) 06-03p, 2006 WL 2329939 at *2. Opinions from medical sources who are not "acceptable medical sources," such as counselor trainees, "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. It may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion. *Id.* at *5. Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in a professional capacity include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. *Id.* at *4. *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Not every factor will apply in every case. SSR 06-03p at *5. The ALJ "should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

Here, substantial evidence supports the ALJ's assessment of Mr. Soto's opinion. First, the ALJ properly considered the fact that Mr. Soto did not have the same level of expertise as the licensed psychologists who examined plaintiff or evaluated her medical records. *See* SSR 06-03p at *4. Further, as the ALJ noted, Mr. Soto's opinion concerning plaintiff's ability to work and functional limitations was inconsistent with the opinion of those licensed psychologists. *See id.* While the ALJ did not provide explicit findings concerning the other factors that should be

27

considered in weighing opinions from "other sources," the ALJ sufficiently explained the weight

given to Mr. Soto's opinion. *See id.* at *6. In any event, a consideration of the other relevant

factors only bolsters the ALJ's decision to give Mr. Soto's opinion little weight. Specifically,

Mr. Soto's opinion does not indicate that he had a treating relationship with plaintiff that was

frequent and long-standing. *See id.* at *4. In fact, Mr. Soto did not state that he had previously

examined plaintiff prior to the date he completed the opinion. (*See* Tr. 744). More importantly,

Mr. Soto's opinion does not provide support for the level of functional limitation that he

assessed. *See* SSR 06-03p at *4; (Tr. 745). Instead, the majority of plaintiff's "mental status

examination" consists of a summary of her subjective complaints and self-reported symptoms.

(*See* Tr. 745). Thus, the relevant factors to be considered when evaluating an "other source"

opinion support the ALJ's decision to afford Mr. Soto's opinion little weight.

     5. *The ALJ properly considered plaintiff's GAF scores.*

     Finally, plaintiff argues that the ALJ erred by relying on GAF scores suggestive of

moderate symptomatology to reject the opinions of Dr. Murphy, Dr. Jeffries, Dr. Buban, and Mr.

Soto. (Doc. 11 at 17-18).

     The ALJ found that plaintiff was "repeatedly assigned GAF scores in the 'moderate'

range." (Tr. 1295). The ALJ specifically noted that Dr. Olson assigned a GAF score of 52,

which was "indicative of 'moderate' symptoms." (*Id.*).

     Here, the ALJ properly referenced the GAF scores in plaintiff's medical record. Even

though GAF scores were eliminated in the Diagnostic and Statistical Manual of Mental

Disorders, Fifth Edition ("DSM-V"), which was published in 2013, the Sixth Circuit has since

explained that GAF scores still "may assist an ALJ in assessing a claimant's mental RFC."

*Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016). Further, the Sixth Circuit held

that "although a GAF score is 'not essential to the RFC's accuracy,' it nevertheless 'may be of considerable help to the ALJ in formulating the RFC.'" *Id.* at 836 (quoting *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002)). Thus, the ALJ properly considered plaintiff's GAF scores as one factor in assessing the weight to give the medical opinions.

    6.  *Conclusion.*

Based on the foregoing, substantial evidence supports the ALJ's weighing of the medical opinions and determination that plaintiff was not disabled, particularly in the time period before plaintiff's date last insured of March 31, 2007 that is at issue on appeal. Accordingly, plaintiff's assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date:   9/15/16

                                             Karen L. Litkovitz
                                             United States Magistrate Judge

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

EMILY MASSEY, on behalf of                    Case No. 1:15-cv-744
RHONDA WARE, deceased,                        Dlott, J.
  Plaintiff,                        Litkovitz, M.J.
  vs.

COMMISSIONER OF
SOCIAL SECURITY,
  Defendant.

### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas* v. *Arn,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

30